**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**

| | |
|---|---|
| ROBERT JON, individually, and on behalf of all others similarly situated,<br><br>     Plaintiff,<br><br>v.<br><br>PERRY JOHNSON & ASSOCIATES, INC. and NORTHWELL HEALTH, INC.<br><br>     Defendants. | Case No.<br>_____<br><br><br>**CLASS ACTION**<br><br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff, ROBERT JON ("Plaintiff"), individually, and on behalf of all others similarly situated (collectively, "proposed Class members"), by and through counsel, brings this Class Action Complaint against Defendants, PERRY JOHNSON & ASSOCIATES, INC. ("PJA"), and NORTHWELL HEALTH, INC. ("Northwell") (collectively, "Defendants"), and complains and alleges upon personal knowledge as to himself, and information and belief as to all other matters as follows.

### INTRODUCTION

1.     Plaintiff brings this class action against Defendants for their failure to secure and safeguard the Personally Identifying Information[1] and Protected Health

_____

[1] The Federal Trade Commission defines "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to

1

Information ("PHI")[2] of him and the proposed Class Members—millions of individuals—including their names, dates of birth, addresses, medical record numbers, hospital account numbers, clinical information such as names of treatment facilities and names of healthcare providers, admission diagnoses, and dates and times of service.[3,4]

    2.    PJA is a third-party vendor of health information technology solutions used by Northwell, Health, Inc., the largest health system in New York.

---

identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 17 C.F.R. § 248.201(b)(8).

[2] Under the Health Insurance Portability and Accountability Act, 42 U.S.C. § 1320d *et seq.*, and its implementing regulations ("HIPAA"), "protected health information" is defined as individually identifiable information relating to the past, present, or future health status of an individual that is created, collected, or transmitted, or maintained by a HIPAA-covered entity in relation to the provision of healthcare, payment for healthcare services, or use in healthcare operations. 45 C.F.R. § 160.103 *Protected health information.* "Business Health information such as diagnoses, treatment information, medical test results, and prescription information are considered protected health information under HIPAA, as are national identification numbers and demographic information such as birth dates, gender, ethnicity, and contact and emergency contact information. *Summary of the HIPAA Privacy Rule*, DEP'T FOR HEALTH & HUM. SERVS., https://www.hhs.gov/hipaa/for-professionals/privacy/laws-regulations/index.html (last accessed Apr. 16, 2020). PJA and Northwell are each clearly a "covered entity" and some of the data compromised in the Data Breach that this action arises out of is "protected health information," subject to HIPAA.

[3] *See* Perry Johnson & Associates, Inc., Notice of Data Breach, (**"Data Breach Notice"**) attached as **Exhibit A**.

[4] Steve Alder, THE HIPPA JOURNAL, *PJ&A Data Breach Total Grows as Kansas City Hospital Confirms 502K-Record Breach*, Jan. 5, 2024 available at https://www.hipaajournal.com/pja-data-breach/ (last accessed Jan. 8, 2024).

3.    Between approximately March 27, 2023, and May 2, 2023, and specifically between April 7, 2023 and April 19, 2023, an unauthorized third party gained access to PJA's network system and obtained files containing information about Northwell's current and former patients (the "Data Breach").[5]

4.    Defendants owed a duty to Plaintiff and Class members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard their PII/PHI against unauthorized access and disclosure.

5.    Defendants breached that duty by, among other things, failing to implement and maintain reasonable security procedures and practices to protect Northwell's patients' PII/PHI from unauthorized access and disclosure, including failing to implement industry standards for data security, and failing to properly train employees on cybersecurity protocols, resulting in the Data Breach.

6.    As a result of Defendants' inadequate security and breach of their duties and obligations, the Data Breach occurred, and Plaintiff's and Class members' PII/PHI was accessed and disclosed to cybercriminals. This action seeks to remedy these failings and their consequences. Plaintiff brings this action on behalf of himself and all persons whose PII/PHI was exposed as a result of the Data Breach, which occurred between approximately March 27, 2023, and May 2, 2023.

7.    Plaintiff, on behalf of himself and all other Class members, asserts

_____

[5] Data Breach Notice, Exhibit A.

claims for negligence, negligence *per se*, breach of fiduciary duty, breach of implied contract, unjust enrichment, and violations of the New York Deceptive Acts and Practices Act, and seeks declaratory relief, injunctive relief, monetary damages, statutory damages, punitive damages, equitable relief, and all other relief authorized by law.

## PARTIES

### *Plaintiff Robert Jon*

8.     Plaintiff is a citizen of the State of New York, where he intends to remain, with a principal residence in Roslyn Heights, New York.

9.     Plaintiff obtained healthcare or related services from Northwell. As a material condition of receiving medical services, Northwell required Plaintiff to provide it with his PII/PHI, which Northwell then provided to PJA.

10.     Based on representations made by Northwell, Plaintiff believed Defendants had implemented and maintained reasonable security and practices to protect his PII/PHI. With this belief in mind, Plaintiff provided his PII/PHI to Northwell in connection with receiving healthcare services provided by Northwell.

11.     At all relevant times, Defendants and stored and maintained Plaintiff's PII/PHI on their computer network systems.

12.     Plaintiff takes great care to protect his PII/PHI. Had Plaintiff known that Northwell does not adequately protect the PII/PHI in its possession, including

by contracting with companies that do not adequately protect the PII/PHI in their possession, such as PJA, he would not have obtained healthcare services from Northwell or agreed to entrust them with his PII/PHI.

13.     Plaintiff received a notice from Defendant PJA dated November 3, 2023 notifying him that his PII and PHI were compromised in the Data Breach.[6]

14.     As a direct result of the Data Breach, Plaintiff and the proposed Class Members have suffered injury and damages including, *inter alia*,  (i) the compromise, publication, and theft of their PII/PHI; (ii) diminution in value of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with time, effort, and money attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in Defendants' possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach; (vii) overpayment for services that were received without adequate data security; and (viii) a substantially increased and imminent risk of identity theft.

**Defendant Northwell Health, Inc.**

15.     Defendant Northwell Health, Inc. is a New York not-for-profit

---

[6] Perry Johnson & Associates, Inc., Notice of Data Breach, Exhibit A.

corporation with its principal place of business at 2000 Marcus Avenue, New Hyde Park, New York 11042.

***Defendant Perry Johnson & Associates, Inc.***

16.    Defendant Perry Johnson & Associates is a Nevada corporation with its principal place of business at 755 W. Big Beaver Road, No. 1300, Troy, Michigan 48084.

## JURISDICTION AND VENUE

17.    The Court has subject matter jurisdiction over Plaintiff's claims under 28 U.S.C. § 1332(d)(2), because (a) there are 100 or more Class members, (b) at least one Class member is a citizen of a state that is diverse from Defendant's citizenship, and (c) the matter in controversy exceeds $5,000,000, exclusive of interest and costs.

18.    This Court has personal jurisdiction over Defendant Perry Johnson & Associates, Inc. because it maintains a headquarters in this State, transacts business within this state and makes or performs contracts within this state.

19.    This Court has personal jurisdiction over Defendant Northwell Health, Inc., because it transacts business within this state and makes or performs contracts within this state.

20.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because PJA has its principal place of business in Michigan, and a substantial part

of the events giving rise to Plaintiff's claims arose in this District.

## FACTUAL ALLEGATIONS

*Overview of Defendants*

21.     Northwell is the largest health system in New York.[7] It employs more than 85,000 people at over 900 locations, including 21 hospitals.[8]

22.     In the regular course of its business, Northwell collects and maintains the PII/PHI of its current and former patients. Northwell required Plaintiff and Class members to provide their PII/PHI as a condition of receiving healthcare services from Northwell.

23.     On its website, Northwell claims "patients are our number one priority and we believe that patient privacy is an integral part of the health care we provide to you."[9] Northwell states, "To ensure the development of a lasting bond of trust with our patients, we have many safeguards to protect the privacy and security of your personal information."[10] Northwell further promises that "[w]e also have many policies in place to protect the privacy and security of your personal information and our employees are educated from the moment they are hired and continually after,

---

[7] *About Northwell*, NORTHWELL HEALTH, https://www.northwell.edu/about-northwell (last accessed Nov. 10, 2023).
[8] *Id.*
[9] *Patient Privacy Overview*, NORTHWELL HEALTH, https://www.northwell.edu/about-northwell/commitment-to-excellence/protecting-patient-privacy (last accessed Nov. 10, 2023).
[10] *Id.*

to respect and protect our patient's privacy."[11]

24.     Northwell's website contains a Notice of Privacy Practices that "explains how we fulfill our commitment to respect the privacy and confidentiality of your protected health information."[12] In the Notice, Northwell admits it is "required by law to make sure that information that identifies you is kept private."

25.     The Privacy Policy includes a list of the ways Northwell may use and disclose its patients' health information, including for treatment, payment, and health care operations, among others.[13] The Privacy Policy promises that disclosures not described in the Notice or permitted by law will be made only with patients' written authorization.[14]

26.     PJA is a "vendor to [Northwell] and its subsidiaries and affiliates []. PJ&A provides certain transcription and dictation services to Northwell. In order to perform these services, PJ&A receives personal health information regarding Northwell patients."[15]

27.     Plaintiff and Class members are current or former patients of Northwell and entrusted Northwell with their PII/PHI. Northwell then transmitted their PII and

---

[11] *Id.*
[12] *Notice of Privacy Practices*, NORTHWELL HEALTH, https://www.northwell.edu/sites/northwell.edu/files/2023-09/notice-of-privacy-practices-english-23.pdf  (last accessed Jan. 8, 2024).
[13] *Id.*
[14] *Id.*
[15] Perry Johnson & Associates, Inc., Notice of Data Breach, Exhibit A.

PHI to PJA in connection with PJA's transcription and dictation services.

***The Data Breach***

28.    As admitted by PJA in the Data Breach Notice, between approximately March 27, 2023, and May 2, 2023, "…an unauthorized party [] accessed and downloaded certain files from [its] systems," and the "unauthorized access to Northwell patient data specifically occurred between April 7, 2023 and April 19, 2023."[16]

29.    According to the Data Breach Notice received by Plaintiff from PJA, the PII/PHI affected in the Data Breach included his name, date of birth, address, medical record number, hospital account number, clinical information such as names of treatment facilities and names of healthcare providers, admission diagnoses, and dates and times of service.[17]

30.    Northwell's Notice of Privacy Practices states, "You have a right to be notified in the event of a breach of the privacy of your unsecured protected health information by Northwell Health or its business associates."[18] It promises patients that they "will be notified as soon as reasonably possible, but no later than 60 days following our discovery of the breach."[19]

_____

[16] *PJA Notice*, *supra* note 9.
[17] *Id.*
[18] *Notice of Privacy Practices*, *supra* note 6.
[19] *Id.*

31.     PJA informed Northwell of the Data Breach on July 21, 2023,[20] but Northwell failed to notify its patients until early November, 2023, over three months later.

32.     Northwell's failure to promptly notify Plaintiff and Class members that their PII/PHI was accessed and stolen virtually ensured that the unauthorized third parties who exploited those security lapses could monetize, misuse, or disseminate that PII/PHI before Plaintiff and Class members could take affirmative steps to protect their sensitive information. As a result, Plaintiff and Class members will suffer indefinitely from the substantial and concrete risk that their identities will be (or already have been) stolen and misappropriated.

***Plaintiff's Experience***

33.     Plaintiff is a patient of Northwell.

34.     As a condition of receiving medical services from Northwell, Plaintiff was required to provide Northwell with his PII/PHI, including his name, date of birth, address, medical record number, hospital account number, clinical information such as names of treatment facilities and names of healthcare providers, admission diagnoses, and dates and times of service.

35.     Northwell then provided Plaintiff's private PII and PHI to its third-party vendor, PJA, in connection with its medical transcription services.

---

[20] Data Breach Notice, Exhibit A.

36.    Plaintiff received Northwell's notice of the Data Breach dated November 3, 2023, informing him that his PII/PHI was impacted in the Data Breach to PJA's systems, including his name, date of birth, address, medical record number, hospital account number, clinical information such as names of treatment facilities and names of healthcare providers, admission diagnoses, and dates and times of service.[21]

37.    Plaintiff is careful to safeguard his PII/PHI from misuse, and has never been involved in a data security breach prior to this Data Breach.

38.    Plaintiff's PII/PHI was unauthorizedly disclosed to cybercriminals in the Data Breach.

39.    On information and belief, based upon the nature of the cyberattack, Plaintiff's PII/PHI impacted in the Data Breach has been posted by cybercriminals to the Dark Web, where is has or imminently will be used for fraudulent purposes, identity theft, and sold.

40.    As a result of the Data Breach, Plaintiff has suffered injury and damages, including (i) the compromise, publication, and theft of his PII/PHI, which on information and belief has been posted to the Dark Web for fraudulent criminal use and sale; (ii) diminution in value of his PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of his

---

[21] Data Breach Notice, Exhibit A.

11

PII/PHI; (iv) lost opportunity costs associated with time, effort, and money attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to his PII/PHI which remains in Defendants' possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach; (vii) overpayment for services that were received without adequate data security; and (viii) a substantially increased and imminent risk of identity theft.

***Defendants Knew that Cybercriminals Target PII/PHI***

41.    At all relevant times, Defendants knew, or should have known, that the information they collected, PII and PHI, was a target for malicious actors.

42.    Despite such knowledge, Defendants failed to implement and maintain reasonable and appropriate data privacy and security measures to protect Plaintiff's and Class members' PII/PHI from cyber-attacks that Defendants should have anticipated and guarded against, resulting in the Data Breach.

43.    It is well known among companies that store sensitive personally identifying information that such information—such as the PII/PHI stolen in the Data Breach—is valuable and frequently targeted by criminals. In a recent article, *Business Insider* noted that "[d]ata breaches are on the rise for all kinds of businesses, including retailers . . . . Many of them were caused by flaws in . . .

12

systems either online or in stores."[22]

44.     Cyber criminals seek out PHI at a greater rate than other sources of personal information. In a 2023 report, the healthcare compliance company Protenus found that there were 956 medical data breaches in 2022 with over 59 million patient records exposed.[23] This is an increase from the 758 medical data breaches which exposed approximately 40 million records that Protenus compiled in 2020.[24]

45.     PII/PHI is a valuable property right.[25] The value of PII/PHI as a commodity is measurable.[26] "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory frameworks."[27] American

---

[22] Dennis Green, Mary Hanbury & Aine Cain, *If you bought anything from these 19 companies recently, your data may have been stolen*, BUS. INSIDER (Nov. 19, 2019, 8:05 A.M.), https://www.businessinsider.com/data-breaches-retailers-consumer-companies-2019-1.

[23] *See 2023 Breach Barometer*, PROTENUS, https://www.protenus.com/breach-barometer-report (last accessed Nov. 10, 2023).

[24] *See id*.

[25] *See* Marc van Lieshout, *The Value of Personal Data*, 457 International Federation for Information Processing 26 (May 2015) ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible…"), https://www.researchgate.net/publication/283668023_The_Value_of_Personal_Data.

[26] *See* Robert Lowes, *Stolen EHR [Electronic Health Record] Charts Sell for $50 Each on Black Market*, MEDSCAPE.COM (April 28, 2014), http://www.medscape.com/viewarticle/824192.

[27] OECD, *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD ILIBRARY (April 2, 2013), https://www.oecd-

companies are estimated to have spent over $19 billion on acquiring personal data of consumers in 2018.[28] It is so valuable to identity thieves that once PII has been disclosed, criminals often trade it on the "cyber black-market," or the "dark web," for many years.

46.     As a result of the real and significant value of these data, identity thieves and other cyber criminals have openly posted credit card numbers, SSNs, PII/PHI, and other sensitive information directly on various internet websites making the information publicly available. This information from various breaches, including the information exposed in the Data Breach, can be readily aggregated with other such data and become more valuable to thieves and more damaging to victims.

47.     PHI is particularly valuable and has been referred to as a "treasure trove for criminals."[29] A cybercriminal who steals a person's PHI can end up with as many as "seven to ten personal identifying characteristics of an individual."[30]

---

ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en.

[28] IAB Data Center of Excellence, *U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017*, IAB.COM (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/.

[29] *See* Andrew Steager, *What Happens to Stolen Healthcare Data*, HEALTHTECH MAG. (Oct. 20, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon (quoting Tom Kellermann, Chief Cybersecurity Officer, Carbon Black, stating "Health information is a treasure trove for criminals.").

[30] *Id.*

48.     All-inclusive health insurance dossiers containing sensitive health insurance information, names, addresses, telephone numbers, email addresses, SSNs, and bank account information, complete with account and routing numbers, can fetch up to $1,200 to $1,300 each on the black market.[31] According to a report released by the Federal Bureau of Investigation's ("FBI") Cyber Division, criminals can sell healthcare records for 50 times the price of a stolen Social Security or credit card number.[32]

49.     Criminals can use stolen PII/PHI to extort a financial payment by "leveraging details specific to a disease or terminal illness."[33] Quoting Carbon Black's Chief Cybersecurity Officer, one recent article explained: "Traditional criminals understand the power of coercion and extortion . . . By having healthcare information—specifically, regarding a sexually transmitted disease or terminal illness—that information can be used to extort or coerce someone to do what you want them to do."[34]

---

[31] *See* SC Staff, *Health Insurance Credentials Fetch High Prices in the Online Black Market*, SC Mag. (July 16, 2013), https://www.scmagazine.com/news/breach/health-insurance-credentials-fetch-high-prices-in-the-online-black-market.

[32] *See* Federal Bureau of Investigation, *Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain* (April 8, 2014), https://www.illuminweb.com/wp-content/uploads/ill-mo-uploads/103/2418/health-systems-cyber-intrusions.pdf.

[33] Steager, *supra* note 23.

[34] *Id.*

50.     Consumers place a high value on the privacy of their data, as they should. Researchers shed light on how much consumers value their data privacy—and the amount is considerable. Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[35]

51.     Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' PII/PHI has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

***Theft of PII/PHI Has Grave and Lasting Consequences for Victims***

52.     Theft of PII/PHI can have serious consequences for the victim. The FTC warns consumers that identity thieves use PII/PHI to receive medical treatment, start new utility accounts, and incur charges and credit in a person's name.[36] [37]

---

[35] Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior*, *An Experimental Study*, 22(2) INFO. SYS. RSCH. 254 (June 2011) https://www.jstor.org/stable/23015560?seq=1.

[36] *See* Federal Trade Commission, *What to Know About Identity Theft*, FED. TRADE COMM'N CONSUMER INFO., https://www.consumer.ftc.gov/articles/what-know-about-identity-theft (last accessed Nov. 10, 2023).

[37] The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 12 C.F.R. § 1022.3(h). The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 12 C.F.R. § 1022.3(g).

53.     Experian, one of the largest credit reporting companies in the world, warns consumers that "[i]dentity thieves can profit off your personal information" by, among other things, selling the information, taking over accounts, using accounts without permission, applying for new accounts, obtaining medical procedures, filing a tax return, and applying for government benefits.[38]

54.     Identity theft is not an easy problem to solve. In a survey, the Identity Theft Resource Center found that almost 20% of victims of identity misuse needed more than a month to resolve issues stemming from identity theft.[39]

55.     Theft of PII is even more serious when it includes theft of PHI. Data breaches involving medical information "typically leave[] a trail of falsified information in medical records that can plague victims' medical and financial lives for years."[40] It "is also more difficult to detect, taking almost twice as long as normal

---

[38] *See* Louis DeNicola, *What Can Identity Thieves Do with Your Personal Information and How Can You Protect Yourself*, EXPERIAN (May 21, 2023), https://www.experian.com/blogs/ask-experian/what-can-identity-thieves-do-with-your-personal-information-and-how-can-you-protect-yourself/.

[39] Identity Theft Resource Center, *2023 Consumer Aftermath Report*, IDENTITY THEFT RES. CTR. (2023), https://www.idtheftcenter.org/publication/2023-consumer-impact-report/ (last accessed Nov. 10, 2023).

[40] Pam Dixon & John Emerson, *The Geography of Medical Identity Theft*, FTC.GOV (Dec. 12, 2017), http://www.worldprivacyforum.org/wp-content/uploads/2017/12/WPF_Geography_of_Medical_Identity_Theft_fs.pdf.

identity theft."[41] In warning consumers on the dangers of medical identity theft, the FTC states that an identity thief may use PII/PHI "to see a doctor, get prescription drugs, buy medical devices, submit claims with your insurance provider, or get other medical care."[42] The FTC also warns, "If the thief's health information is mixed with yours it could affect the medical care you're able to get or the health insurance benefits you're able to use."[43]

56.     A report published by the World Privacy Forum and presented at the US FTC Workshop on Informational Injury describes what medical identity theft victims may experience:

    a.     Changes to their health care records, most often the addition of falsified information, through improper billing activity or activity by imposters. These changes can affect the healthcare a person receives if the errors are not caught and corrected.

    b.     Significant bills for medical goods and services neither sought nor received.

    c.     Issues with insurance, co-pays, and insurance caps.

---

[41] *See* Federal Bureau of Investigation, *Health Care Systems and Medical Devices at Risk . . ., supra* note 26.

[42] *See What to Know About Medical Identity Theft*, Fed. Trade Comm'n Consumer Info., https://www.consumer.ftc.gov/articles/what-know-about-medical-identity-theft (last accessed Nov. 10, 2023).

[43] *Id.*

d.     Long-term credit problems based on problems with debt collectors reporting debt due to identity theft.

e.     Serious life consequences resulting from the crime; for example, victims have been falsely accused of being drug users based on falsified entries to their medical files; victims have had their children removed from them due to medical activities of the imposter; victims have been denied jobs due to incorrect information placed in their health files due to the crime.

f.     As a result of improper and/or fraudulent medical debt reporting, victims may not qualify for mortgage or other loans and may experience other financial impacts.

g.     Phantom medical debt collection based on medical billing or other identity information.

h.     Sales of medical debt arising from identity theft can perpetuate a victim's debt collection and credit problems, through no fault of their own. [44]

57.     There may also be time lags between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. On average it takes approximately three months for consumers to discover their

---

[44] *See* Dixon & Emerson, *supra* note 34.

identity has been stolen and used, but it takes some individuals up to three years to learn that information.[45]

### Defendants Failed to Comply with FTC Guidelines

58.     The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

59.     In 2016, the FTC updated its publication, *Protecting PII/PHI: A Guide for Business*, which establishes cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of PII/PHI that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[46]

---

[45] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 J. OF SYSTEMICS, CYBERNETICS AND INFORMATICS 9 (2019), http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

[46] *See* Federal Trade Commission, October 2016, "Protecting Private information: A Guide for Business," available at

60.     The FTC further recommends that companies not maintain PII/PHI longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[47]

61.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

62.     These FTC enforcement actions include actions against entities failing to safeguard PII/PHI such as Defendants. *See, e.g., In the Matter of LabMD, Inc., A Corp*, 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

---

https://www.bulkorder.ftc.gov/system/files/publications/2_9-00006_716a_protectingpersinfo-508.pdf (last acc. Apr. 14, 2023).
[47] *See id*.

63.     Defendants failed to properly implement basic data security practices widely known throughout the industry. Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to patient PII/PHI constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

64.     Defendants were at all times fully aware of their obligations to protect the PII/PHI of its current and former patients. Defendants were also aware of the significant repercussions that would result from their failure to do so.

***Defendants Failed to Comply with Industry Standards***

65.     As shown above, experts studying cyber security routinely identify organizations holding PII/PHI as being particularly vulnerable to cyber-attacks because of the value of the information they collect and maintain. As of 2022, ransomware breaches like that which occurred here had grown by 41% in the last year and cost on average $4.54 million dollars.[48]

66.     A number of industry and national best practices have been published and are widely used as a go-to resource when developing an institution's cybersecurity standards. The Center for Internet Security's (CIS) CIS Critical Security Controls (CSC) recommends certain best practices to adequately secure

---

[48] IBM, "Cost of a data breach 2022: A million-dollar race to detect and respond," available at https://www.ibm.com/reports/data-breach (last acc. Apr. 14, 2023).

data and prevent cybersecurity attacks, including 18 Critical Security Controls of Inventory and Control of Enterprise Assets, Inventory and Control of Software Assets, Data Protection, Secure Configuration of Enterprise Assets and Software, Account Management, Access Control Management, Continuous Vulnerability Management, Audit Log Management, Email and Web Browser Protections, Malware Defenses, Data Recovery, Network Infrastructure Management, Network Monitoring and Defense, Security Awareness and Skills Training, Service Provider Management, Application Software Security, Incident Response Management, and Penetration Testing.[49]

67.    In addition, the National Institute of Standards and Technology (NIST) recommends certain practices to safeguard systems, *infra,* such as:

- Control who logs on to your network and uses your computers and other devices.

- Use security software to protect data.

- Encrypt sensitive data, at rest and in transit.

- Conduct regular backups of data.

- Update security software regularly, automating those updates if possible.

- Have formal policies for safely disposing of electronic files and old devices.

---

[49] *See* https://www.rapid7.com/solutions/compliance/critical-controls/ (last acc. Apr. 14, 2023).

- Train everyone who uses your computers, devices, and network about cybersecurity. You can help employees understand their personal risk in addition to their crucial role in the workplace.[50]

68.     Further still, the Cybersecurity & Infrastructure Security Agency makes specific recommendations to guard against ransomware attacks.[51]

69.     Upon information and belief, Defendants failed to meet the minimum standards of both the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2) and the Center for Internet Security's Critical Security Controls (CIS CSC), which are established frameworks for reasonable cybersecurity readiness, and other industry standards for protecting Plaintiff's and the proposed Class Members' PII/PHI, resulting in the Data Breach.

***Defendants' Conduct Violates HIPAA and Evidences Their Insufficient Data Security***

70.     HIPAA requires covered entities to protect against reasonably anticipated threats to the security of sensitive patient health information.

---

[50] Understanding The NIST Cybersecurity Framework, https://www.ftc.gov/business-guidance/small-businesses/cybersecurity/nist-framework (last acc. Apr. 14, 2023).
[51] Cybersecurity & Infrastructure Security Agency, April 11, 2019 (rev. Sept. 2, 2021) available at https://www.cisa.gov/news-events/news/protecting-against-ransomware (last acc. Apr. 14, 2023).

71.   Covered entities must implement safeguards to ensure the confidentiality, integrity, and availability of sensitive patient health information. Safeguards must include physical, technical, and administrative components.

72.   Title II of HIPAA contains what are known as the Administrative Simplification provisions. 42 U.S.C. § 1301, *et seq*. These provisions require, among other things, that the Department of Health and Human Services ("HHS") create rules to streamline the standards for handling PII/PHI like the data Defendants left unguarded. HHS subsequently promulgated multiple regulations under authority of the Administrative Simplification provisions of HIPAA. These rules include 45 C.F.R. § 164.306(a)(1-4); 45 C.F.R. § 164.312(a)(1); 45 C.F.R. § 164.308(a)(1)(i); 45 C.F.R. § 164.308(a)(1)(ii)(D), and 45 C.F.R. § 164.530(b).

73.   Defendants' Data Breach resulted from a combination of insufficiencies that demonstrate it failed to comply with safeguards mandated by HIPAA regulations.

74.   Defendants breached their obligations to Plaintiff and the Class Members and/or was otherwise negligent and reckless because they failed to properly maintain and safeguard their computer systems, network, and data, and because Northwell failed to ensure that PJA did do.

75.   Defendants' unlawful conduct includes, but is not limited to, the following acts and/or omissions:

a.   Failing to adequately protect patients' PHI, or of Northwell to ensure that PJA adequately protected patients' PHI;

b.   Failing to install the latest software patches, update its firewalls, check user account privileges, or ensure proper security practices;

c.   Failing to practice the principle of least-privilege and maintain credential hygiene;

d.   Failing to avoid the use of domain-wide, admin-level service accounts;

e.   Failing to employ or enforce the use of strong randomized, just-in-time local administrator passwords;

f.   Failing to ensure the confidentiality and integrity of electronic PHI they created, received, maintained, and/or transmitted, in violation of 45 C.F.R. § 164.306(a)(1);

g.   Failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of  45 C.F.R. § 164.312(a)(1);

h.   Failing to implement procedures to review records of

information system activity regularly, such as audit logs, access reports, and security incident tracking reports in violation of 45 C.F.R. § 164.308(a)(1)(ii)(D);

i.  Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

j.  Failing to protect against reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3); and/or

k.  Failing to render the electronic PHI they maintained unusable, unreadable, or indecipherable to unauthorized individuals, as it had not encrypted the electronic PHI as specified in the HIPAA Security Rule by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without use of a confidential process or key," 45 CFR § 164.304 (definition of encryption).

76.  As the result of Defendants' violations, Defendants negligently and unlawfully failed to safeguard Plaintiff's and the Class Members' PII/PHI.

*Damages Sustained by Plaintiff and Class Members*

77.    As a result of the Data Breach Defendants permitted to occur, Plaintiff and Class members have suffered and will suffer injury, including, but not limited to: (i) the compromise, publication, and theft of their PII/PHI, which on information and belief has been posted to the Dark Web by cybercriminals for fraudulent criminal use and sale; (ii) diminution in value of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with time, effort, and money attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in Defendants' possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach; (vii) overpayment for services that were received without adequate data security; and (viii) a substantially increased and imminent risk of identity theft.

## CLASS ALLEGATIONS

78.    This action is brought and may be properly maintained as a class action pursuant to Federal Rule of Civil Procedure 23.

79.    Plaintiff brings this action on behalf of himself and all members of the following Class of similarly situated persons:

All United States residents whose PII/PHI was accessed by and disclosed to unauthorized persons in Defendants' Data Breach,

including all who were sent a notice of the Data Breach.

80.     Excluded from the Class are Northwell Health, Inc., and its affiliates, parents, subsidiaries, employees, officers, agents, and directors; Perry Johnson & Associates, Inc., and its affiliates, parents, subsidiaries, employees, officers, agents, and directors; as well as the judge(s) presiding over this matter and the clerks of said judge.

81.     Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

82.     The members in the Class are so numerous that joinder of each of the Class members in a single proceeding would be impracticable. On information and belief, at least 4 million Northwell patients were impacted in the Data Breach, and 9 million in the PJA Data Breach overall.[52]

83.     Common questions of law and fact exist as to all Class members and predominate over any potential questions affecting only individual Class members. Such common questions of law or fact include, *inter alia*:

            a. Whether Defendants had a duty to implement and maintain

---

[52] Susanne Smalley, The Record, *Nearly 9 million patients' records compromised in data breach,* November 20, 2023, available at https://therecord.media/millions-of-patient-records-breached-cyberattack

reasonable security procedures and practices to protect and secure Plaintiff's and Class members' PII/PHI from unauthorized access and disclosure;

b. Whether Defendants had duties not to disclose the PII/PHI of Plaintiff and Class members to unauthorized third parties;

c. Whether Defendants failed to exercise reasonable care to secure and safeguard Plaintiff's and Class members' PII/PHI;

d. Whether an implied contract existed between Class members and Defendants, providing that Defendants would implement and maintain reasonable security measures to protect and secure Class members' PII/PHI from unauthorized access and disclosure;

e. Whether Defendants engaged in unfair, unlawful, or deceptive practices by failing to safeguard the PII/PHI of Plaintiff and Class members;

f. Whether Defendants breached their duties to protect Plaintiff's and Class members' PII/PHI; and

g. Whether Plaintiff and Class members are entitled to damages and the measure of such damages and relief.

84.    Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff, on behalf of himself and all other Class

members. Individual questions, if any, pale in comparison, in both quantity and quality, to the numerous common questions that dominate this action.

85.    Plaintiff's claims are typical of the claims of the Class. Plaintiff, like all proposed members of the Class, had his PII/PHI compromised in the Data Breach. Plaintiff and Class members were injured by the same wrongful acts, practices, and omissions committed by Defendants, as described herein. Plaintiff's claims therefore arise from the same practices or course of conduct that give rise to the claims of all Class members.

86.    Plaintiff will fairly and adequately protect the interests of the Class members. Plaintiff is an adequate representative of the Class in that he has no interests adverse to, or that conflict with, the Class he seeks to represent. Plaintiff has retained counsel with substantial experience and success in the prosecution of complex consumer protection class actions of this nature.

87.    A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages and other financial detriment suffered by Plaintiff and Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for Class members to individually seek redress from Defendants' wrongful conduct. Even if Class members could

afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

**CAUSES OF ACTION**

**COUNT I**
**NEGLIGENCE**

88.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

89.    Defendants owed a duty to Plaintiff and Class members to exercise reasonable care in safeguarding and protecting the PII/PHI in their possession, custody, or control.

90.    Defendants knew or should have known the risks of collecting and storing Plaintiff's and all other Class members' PII/PHI and the importance of maintaining secure systems. Defendants knew or should have known of the many data breaches that targeted healthcare provides that collect and store PII/PHI in recent years.

91.    Given the nature of Defendants' businesses, the sensitivity and value of the PII/PHI they maintain, and the resources at their disposal, Defendants should have identified the vulnerabilities to their systems or their third-party

vendor's systems and prevented the Data Breach from occurring.

92. Defendants breached these duties by failing to, or contracting with companies that failed to, exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII/PHI by failing to, or contracting with companies that failed to, design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect PII/PHI entrusted to it—including Plaintiff's and Class members' PII/PHI.

93. It was reasonably foreseeable to Defendants that their failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII/PHI by failing to, or contracting with companies that failed to, design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems would result in the unauthorized release, disclosure, and dissemination of Plaintiff's and Class members' PII/PHI to unauthorized individuals.

94. But for Defendants' negligent conduct or breach of the above-described duties owed to Plaintiff and Class members, their PII/PHI would not have been compromised.

95. As a result of Defendants' above-described wrongful actions, inaction, and want of ordinary care that directly and proximately caused the Data Breach,

Plaintiff and Class members have suffered and will imminently suffer injury, including, but not limited to: (i) the compromise, publication, and theft of their PII/PHI; (ii) diminution in value of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with time, effort, and money attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in Defendants' possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach; (vii) overpayment for services that were received without adequate data security; and (viii) a substantially increased and imminent risk of identity theft.

96.    As a direct and proximate result of Defendants' conduct in permitting the Data Breach to occur, Plaintiff and the proposed Class Members are entitled to actual and compensatory damages, as well as punitive damages.

## COUNT II
## NEGLIGENCE *PER SE*

97.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

98.    Defendants' duties arise from, *inter alia*, the HIPAA Privacy Rule ("Standards for Privacy of Individually Identifiable Health Information"), 45 C.F.R.

Part 160 and Part 164, Subparts A and E, and the HIPAA Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C (collectively, "HIPAA Privacy and Security Rules").

99.    Defendants' duties also arise from Section 5 of the FTC Act ("FTCA"), 15 U.S.C. § 45(a)(1), which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted by the FTC, the unfair act or practice by business, such as Northwell, of failing to employ reasonable measures to protect and secure PII/PHI.

100.    Defendants violated HIPAA Privacy and Security Rules, HIPAA, and Section 5 of the FTCA, and by failing to, or contracting with companies that failed to, use reasonable measures to protect Plaintiff's and other Class members' PII/PHI, by failing to provide timely notice, and by not complying with applicable industry standards. Defendants' conduct was particularly unreasonable given the nature and amount of PII/PHI they obtain and store, and the foreseeable consequences of a data breach involving PII/PHI including, specifically, the substantial damages that would result to Plaintiff and the other Class members.

101.    Defendants' violation of the HIPAA Privacy and Security Rules and Section 5 of the FTCA constitutes negligence *per se*.

102.   Plaintiff and Class members are within the class of persons that the HIPAA Privacy and Security Rules and Section 5 of the FTCA were intended to protect.

103.   The harm occurring as a result of the Data Breach is the type of harm that the HIPAA Privacy and Security Rules and Section 5 of the FTCA were intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair practices or deceptive practices, caused the same type of harm that has been suffered by Plaintiff and Class members as a result of the Data Brach.

104.   It was reasonably foreseeable to Defendants that their failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII/PHI by failing to, or contracting with companies that failed to, design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems, would result in the release, disclosure, and dissemination of Plaintiff's and Class members' PII/PHI to unauthorized individuals.

105.   The injury and harm that Plaintiff and the other Class members suffered was the direct and proximate result of Defendants' violations of harm the HIPAA Privacy and Security Rules and Section 5 of the FTCA. Plaintiff and Class

Members have suffered and will imminently suffer injury, including, but not limited to: (i) the compromise, publication, and theft of their PII/PHI; (ii) diminution in value of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with time, effort, and money attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in Defendants' possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach; (vii) overpayment for services that were received without adequate data security; and (viii) a substantially increased and imminent risk of identity theft.

106.   As a direct and proximate result of Defendants' negligence *per se*, Plaintiff and the proposed Class Members are entitled to actual and compensatory damages, as well as punitive damages.

## COUNT III
## BREACH OF FIDUCIARY DUTY
### (*Against Northwell Only*)

107.  Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

108.  This claim is brought by Plaintiff on behalf of all Class members who provided their PII/PHI to Northwell, which was then provided to its third-

party vendor, PJA.

109. Plaintiff and Class members gave Northwell their PII/PHI in confidence, believing that Northwell would protect that information. Plaintiff and Class members would not have provided Northwell with this information had they known it would not be adequately protected. Northwell's acceptance and storage of Plaintiff's and Class members' PII/PHI created a fiduciary relationship between Northwell and Plaintiff and Class members. In light of this relationship, Northwell must act primarily for the benefit of its patients, which includes safeguarding and protecting Plaintiff's and Class Members' PII/PHI.

110. Due to the nature of the relationship between Northwell and Plaintiff and Class members, Plaintiff and Class members were entirely reliant upon Northwell to ensure that their PII/PHI was adequately protected. Plaintiff and Class members had no way of verifying or influencing the nature and extent of Northwell's or its vendors data security policies and practices, and Northwell was in an exclusive position to guard against the Data Breach.

111. Northwell has a fiduciary duty to act for the benefit of Plaintiff and Class Members upon matters within the scope of their relationship. Northwell breached that duty by contracting with companies, including PJA, that failed to properly protect the integrity of the system containing Plaintiff's and Class members' PII/PHI, failing to comply with the data security guidelines set forth

by HIPAA, and otherwise failing to safeguard Plaintiff's and Class members' PII/PHI that they collected.

112. As a direct and proximate result of Northwell's breaches of its fiduciary duties, Plaintiff and Class Members have suffered and will imminently suffer injury, including, but not limited to: (i) the compromise, publication, and theft of their PII/PHI; (ii) diminution in value of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with time, effort, and money attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in Defendants' possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach; (vii) overpayment for services that were received without adequate data security; and (viii) a substantially increased and imminent risk of identity theft.

113. As a direct and proximate result of Defendants' conduct in permitting the Data Breach to occur, Plaintiff and the proposed Class Members are entitled to actual and compensatory damages, as well as punitive damages.

## COUNT IV
## BREACH OF IMPLIED CONTRACT
### (*Against Northwell Only*)

114.  Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

115.  This claim is brought by Plaintiff on behalf of all Class members who provided their PII/PHI to Northwell, which was then provided to its third-party vendor, PJA.

116.  In connection with receiving healthcare services, Plaintiff and all other Class members entered into implied contracts with Northwell.

117.  Pursuant to these implied contracts, Plaintiff and Class members paid money to Northwell, directly or through their insurance, and provided Northwell with their PII/PHI. In exchange, Northwell agreed to, among other things, and Plaintiff and Class members understood that Northwell would: (1) provide services to Plaintiff and Class members; (2) take reasonable measures to protect the security and confidentiality of Plaintiff's and Class members' PII/PHI; and (3) protect Plaintiff's and Class members' PII/PHI in compliance with federal and state laws and regulations and industry standards.

118.  The protection of PII/PHI was a material term of the implied contracts between Plaintiff and Class members, on the one hand, and Northwell, on the other hand. Indeed, as set forth *supra*, Northwell recognized the

importance of data security and the privacy of Northwell's patients' PII/PHI. Had Plaintiff and Class members known that Northwell would not adequately protect their PII/PHI, they would not have received healthcare or other services from Northwell.

119.   Plaintiff and Class members performed their obligations under the implied contract when they provided Northwell with their PII/PHI and paid for healthcare or other services from Northwell.

120.   Northwell breached its obligations under its implied contracts with Plaintiff and Class members in failing to implement and maintain reasonable security measures to protect and secure their PII/PHI, including by ensuring companies it contracts with implement and maintain reasonable security measures to protect PII/PHI, and in failing to implement and maintain security protocols and procedures to protect Plaintiff's and Class members' PII/PHI in a manner that complies with applicable laws, regulations, and industry standards.

121.   Northwell's breach of its obligations of its implied contracts with Plaintiff and Class members directly resulted in the Data Breach and the injuries that Plaintiff and all other Class members have suffered from the Data Breach.

122.   Plaintiff and all other Class members were damaged by Northwell's breach of implied contracts because: (i) they paid—directly or through their insurers—for data security protection they did not receive; (ii) they face a

substantially increased risk of identity theft and medical theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (iii) their PII/PHI was improperly disclosed to unauthorized individuals; (iv) the confidentiality of their PII/PHI has been breached; (v) they were deprived of the value of their PII/PHI, for which there is a well-established national and international market; (vi) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of identity theft they face and will continue to face; and (vii) overpayment for services that were received without adequate data security.

## COUNT V
## UNJUST ENRICHMENT

123.  Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

124.  This claim is pleaded in the alternative to Plaintiff's breach of implied contract claim.

125.  Plaintiff and Class members conferred a monetary benefit upon Defendants in the form of monies paid to Northwell for healthcare services, which Northwell used in turn to pay for PJA's services, and through the provision of their PII/PHI.

126.  Defendants accepted or had knowledge of the benefits conferred upon them by Plaintiff and Class members. Defendants also benefitted from the receipt of

Plaintiff's and Class members' PII/PHI, as this was used to facilitate billing services and services provided to Northwell.

127. As a result of Defendants' conduct, Plaintiff and Class members suffered actual damages in an amount equal to the difference in value between their payments made with reasonable data privacy and security practices and procedures that Plaintiff and Class members paid for, and those payments without reasonable data privacy and security practices and procedures that they received.

128. Defendants should not be permitted to retain the money belonging to Plaintiff and Class members because Defendants failed to adequately implement the data privacy and security procedures for themselves that Plaintiff and Class members paid for and that were otherwise mandated by federal, state, and local laws and industry standards.

129. Plaintiff and Class members have no adequate remedy at law.

130. Defendants should be compelled to provide for the benefit of Plaintiff and Class members all unlawful proceeds received by them as a result of the conduct and Data Breach alleged herein.

### COUNT VI
### VIOLATIONS OF THE NEW YORK DECEPTIVE ACTS AND PRACTICES ACT, N.Y. Gen. Bus. Law § 349 ("GBL")
### (*Against Northwell Only*)

131. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

43

132.   New York General Business Law § 349(a) states, "Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."

133.   Northwell is a "person, firm, corporation or association or agent or employee thereof" within the meaning of the GBL. N.Y. Gen. Bus. Law § 349(b). At all relevant times, Northwell was engaged in "business," "trade," or "commerce" within the meaning of the GBL. *See* N.Y. Gen. Bus. Law § 349(a).

134.   Plaintiff and Class members are "persons" within the meaning of Gen. Bus. Law § 349(h).

135.   Northwell promised to protect, but subsequently failed to adequately safeguard and maintain, Plaintiff's and Class members' PII/PHI. Northwell failed to notify Plaintiff and other Class members that, contrary to its representations about valuing data security and privacy, it does not maintain adequate controls to protect their PII/PHI, including by ensuring companies it contracts with maintain adequate data protection practices.

136.   Had Plaintiff and Class members been aware that Northwell omitted or misrepresented facts regarding the adequacy of its data security safeguards, Plaintiff and Class members would not have accepted services from Northwell.

137.   Northwell's failure to make Plaintiff and Class members aware that it would not adequately safeguard their information, while maintaining that it would,

is a "deceptive act or practice" under N.Y. Gen. Bus. Law § 349.

138.  Plaintiff and all other Class members were damaged by Northwell's unfair and deceptive trade practices because: (i) they paid—directly or through their insurers—for data security protection they did not receive; (ii) they face a substantially increased risk of identity theft and medical theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (iii) their PII/PHI was improperly disclosed to unauthorized individuals; (iv) the confidentiality of their PII/PHI has been breached; (v) they were deprived of the value of their PII/PHI, for which there is a well-established national and international market; (vi) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of identity theft they face and will continue to face; and (vii) overpayment for services that were received without adequate data security; and (ix) emotional distress, worry and anxiety over the information disclosed in the Data Breach.

139.  Pursuant to Gen. Bus. Law § 349(h), Plaintiff seeks damages on behalf of himself and Class members in the amount of the greater of actual damages or $50 for each violation of N.Y. Gen. Bus. Law § 349. Because Northwell's conduct was committed willfully and knowingly, Plaintiff and Class members are entitled to recover up to three times their actual damages, up to $1,000.

## PRAYER FOR RELIEF

Plaintiff, ROBERT JON, individually and on behalf of all other members of the Class, respectfully requests that the Court enter judgment in his favor and against Defendants as follows:

A.      Certifying the Class as requested herein, designating Plaintiff as Class Representative, and appointing Plaintiff's counsel as Class Counsel;

B.      Awarding Plaintiff and the Class appropriate monetary relief, including actual damages, compensatory damages, statutory damages, punitive damages, restitution, and disgorgement;

C.      Awarding Plaintiff and the Class equitable, injunctive, and declaratory relief, as may be appropriate. Plaintiff, on behalf of himself and the Class, seeks appropriate injunctive relief designed to prevent Defendants from experiencing another data breach by adopting and implementing best data security practices to safeguard PII/PHI and to provide or extend credit monitoring services and similar services to protect against all types of identity theft and medical identity theft;

D.      Awarding Plaintiff and the Class pre-judgment and post-judgment interest to the maximum extent allowable;

E.      Awarding Plaintiff and the Class reasonable attorneys' fees, costs, and expenses, as allowable; and

F.    Awarding Plaintiff and the Class such other favorable relief as allowable by law.

## **JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury of all claims in this Class Action Complaint so triable.

Dated: January 12, 2024          Respectfully submitted,

_/s/ E. Powell Miller_
E. Powell Miller (P39487)
Emily E. Hughes (P68724)
**MILLER LAW FIRM**
950 W. University Drive, Suite 300
Rochester, Michigan 48307
(248) 791-9813
(248) 652-2852 (facsimile)
epm@millerlawpc.com
eeh@millerlawpc.com

J. Gerard Stranch, IV*
Andrew E. Mize*
**STRANCH, JENNINGS & GARVEY, PLLC**
223 Rosa L. Parks Avenue, Suite 200
Nashville, Tennessee 37203
(615) 254-8801
gstranch@stranchlaw.com
amize@stranchlaw.com

_*admission forthcoming_

**_Counsel for Plaintiff and Proposed Class_**